# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                              No. CV 00-1338 JP/RLP

ITEM 1: A 1990 JEEP CHEROKEE;
ITEM 2: $ 40,000 IN U.S. CURRENCY;
ITEM 3: $ 50,000 IN U.S. CURRENCY;
ITEM 4: $19,830 IN U.S. CURRENCY;
ITEM 5: $19,882.40 IN U.S. CURRENCY;
ITEM 6: $8,753.11 IN U.S. CURRENCY; AND
ITEM 7: JEWELRY AND MISC. PERSONAL ITEMS,

        Defendants,

and

OLAF JUDA,

        Claimant.

## MEMORANDUM OPINION AND ORDER

On November 8, 2002 Plaintiff United States of America filed its Second Motion for Summary Judgment (Doc. No. 27). On June 16, 2003 the Court filed a Memorandum Opinion and Order granting Plaintiff's Motion to Amend Complaint, which Plaintiff had filed on the same date as it filed the Second Motion for Summary Judgment. The Court deferred a ruling on the summary judgment motion to allow Claimant Olaf Juda additional time to respond to the motion based on the amended complaint. On July 14, 2003 Juda filed his Cross Motion for Summary Judgment (Doc. No. 40), which also constitutes his response to Plaintiff's Second Motion for

Summary Judgment.  After carefully considering the pleadings, the facts of record, the arguments of counsel and of the *pro se* Claimant, and the relevant case law, the Court will grant Plaintiff's Second Motion for Summary Judgment and deny Claimant's Cross Motion for Summary Judgment.  Accordingly, a separate Summary Judgment of Forfeiture will be entered contemporaneously herewith in favor of Plaintiff and against Claimant forfeiting the Defendant Items to Plaintiff.

On August 8, 2003 Plaintiff filed a Motion to Set Date and Time for Telephonic Summary Judgment Hearing (Doc. No. 42).  That motion will be denied as moot.

**Background.**  The Defendant items of property were seized in New Mexico following Mr. Juda's arrest in California in 1991.  Mr. Juda pled guilty to drug smuggling and arson on the high seas as a result of that arrest.  The property items were administratively forfeited in New Mexico.  Mr. Juda challenged the forfeitures by filing a civil action in California that was transferred to this Court, Olaf Peter Juda v. Dennis Michael Nerney, et al., D.N.M., CV 96-584 JP/LFG.  The administrative forfeitures were vacated by the Tenth Circuit Court of Appeals. Juda v. Nerney, 149 F.3d 1190 (10th Cir. 1998) (unpublished) (holding government failed to establish it had given proper notices of forfeitures to Mr. Juda); Juda v. Nerney, 211 F.3d 1278 (10th Cir. 2000) (unpublished) (holding administrative forfeitures void because of constitutionally defective notice, and statute of limitations might bar institution of judicial forfeiture proceedings). After this Court determined that the statute of limitations was equitably tolled, the government filed the present case for judicial forfeiture under 21 U.S.C. § 881(a)(6).

Claimant Juda filed a motion to dismiss for lack of subject matter jurisdiction, which this Court denied on August 6, 2001 (Doc. No. 16).  Plaintiff United States then filed a motion for

summary judgment based on the principle of collateral estoppel, which this Court denied on October 11, 2002 (Doc. No. 24). Thereafter, Claimant filed a motion to dismiss for failure to state a claim, which the Court denied on June 16, 2003.

**Standards for Summary Judgment.** Summary judgment is appropriate only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit. *See* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Ingels v. Thiokol Corp., 42 F.3d 616, 620 (10th Cir. 1994), *quoting* Anderson v. Liberty Lobby, Inc., 477 U.S. at 248.

The burden of showing that no genuine issue of material fact exists is borne by the moving party. *See* Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998). The court draws all reasonable inferences in favor of the nonmoving party. *See* Ortiz v. Norton, 254 F.3d 889, 893 (10th Cir. 2001); Curtis v. Oklahoma City Public Sch. Bd. of Ed., 147 F.3d 1200, 1214 (10th Cir. 1998).

**Burden of Proof.** Under the government's original theory of forfeiture, that the items of property are subject to forfeiture as proceeds of a drug offense, the government must establish by a preponderance of the evidence that the items of property are subject to forfeiture and that there was a substantial connection between the property and an offense under the Controlled

Substances Act.  18 U.S.C. § 983(c)(3);[1] 21 U.S.C. § 881(a)(6).[2]

The government disputes that the "substantial connection" requirement of subsection (3) of § 983(c) applies because its theory is not that the property was used to commit or facilitate a crime, or was involved in a crime, but rather that the property is proceeds of a criminal offense, in which case a substantial connection to the crime is patent.  The substantial connection requirement, however, is derived not only from § 983(c)(3), but also from legislative history of 21 U.S.C. § 881(a)(6), and it applies in cases like this one involving forfeiture of proceeds of drug crimes.  See United States v. Carrell, 252 F.3d 1193, 1200 n.7 (11th Cir. 2001); United States v. Four Million, Two Hundred Fifty-Five Thousand, 762 F.2d 895, 902 n.14 (11th Cir. 1985).

Juda has asserted that all the Defendant Items of property were derived from his smuggling drugs into Canada in 1989.  This admission undoubtedly serves to satisfy the substantial connection requirement.  Juda disputes, however, that drug smuggling into Canada constitutes an offense under the Controlled Substances Act of the United States.

Under the government's alternate theory of forfeiture alleged in its Amended Complaint,

---

[1] 18 U.S.C. § 983(c) provides:
(c) Burden of proof. -- In a suit or action brought under any civil forfeiture statute for the civil forfeiture of any property--
 (1) the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture;
 (2) the Government may use evidence gathered after the filing of a complaint for forfeiture to establish, by a preponderance of the evidence, that property is subject to forfeiture;  and
 (3) if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense.

[2] 21 U.S.C. § 881(a)(6) provides for forfeiture of "[a]ll money, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all money, negotiable instruments, securities used or intended to be used to facilitate any violations of this subchapter."

that the items of property are subject to forfeiture as proceeds of a foreign drug crime, the government must establish by a preponderance of the evidence that the property constitutes proceeds obtained directly or indirectly from a foreign drug crime punishable by imprisonment for over one year, both in the foreign nation and in the United States.  18 U.S.C. § 981(a)(1)(B).[3] Juda's only defense against this charge is that the statute is unconstitutional.

**Undisputed material facts.**  The material facts presented by Plaintiff in support of its motion that are undisputed by Claimant, and the disputed facts viewed in the light most favorable to the Claimant, are the following.  Olaf Juda was the captain of a ship, the Elmo's Fire, that was used in an attempt to import 17,000 pounds of Thai marijuana into the United States in 1987.  That shipment was seized by law enforcement after being offloaded in southern Oregon in June 1987.  Juda was the skipper of the same ship used to transport 10 tons of hashish from Southeast Asia to Queen Charlotte Islands, British Columbia, Canada in March 1989.  His crew members on the 1989 trip included Anthony Burg, Manuel Avila, and David Liggon.

United States Customs Agent Ronald Landmann began a series of undercover telephone conversations and meetings with Juda in November 1990.  Landmann met with Juda in

---

[3] 18 U.S.C. § 981(a)(1)(B) provides for civil forfeiture of:
> Any property, real or personal, within the jurisdiction of the United States, constituting, derived from, or traceable to, any proceeds obtained directly or indirectly from an offense against a foreign nation, or any property used to facilitate such an offense, if the offense--
> (i) involves the manufacture, importation, sale, or distribution of a controlled substance (as that term is defined for purposes of the Controlled Substances Act), or any other conduct described in section 1956(c)(7)(B);
> (ii) would be punishable within the jurisdiction of the foreign nation by death or imprisonment for a term exceeding 1 year; and
> (iii) would be punishable under the laws of the United States by imprisonment for a term exceeding 1 year, if the act or activity constituting the offense had occurred within the jurisdiction of the United States.

5

Albuquerque, New Mexico on November 19, 1990 on the pretext of purchasing the Elmo's Fire.[4] During that meeting, and at another meeting in San Francisco, California on December 19, 1990, Juda revealed that he was planning to smuggle 25 tons of hashish from the Far East into Canada in March 1991. Juda reported that he would be skipper of a recently-purchased vessel transporting 15 tons of the hashish, and he offered to load the vessel Landmann was negotiating to purchase with the remaining 10 tons of hashish.

Landmann traveled to Juda's residence in Taos, New Mexico on February 8, 1991, where Juda discussed with him the final arrangements for the sale of the Elmo's Fire and provided the latest information about the smuggling of hashish. Juda said he would depart from Australia on the ship Elevation later that month bound for Singapore, then load the hashish either from Singapore or from the Philippines at Cebu. The name of the ship would be changed from Elevation to Malekula. Between November 6, 1990 and February 27, 1991 Landmann made approximately 26 telephone calls to Juda, 15 of which involved substantive discussions of the hashish smuggling venture.

On July 16, 1991 Juda was the skipper of the Malekula when it was tracked and intercepted by the U.S. Coast Guard in international waters about 360 nautical miles off the coast of Canada. Juda denied the Coast Guard's request to board the vessel and threatened to shoot. Before agents could board it, an explosion ripped the bow of the Malekula, a fire ensued, and the ship began to sink. Juda and his five crew members jumped from the Malekula and were arrested.

---

[4] Juda does not deny discussing the sale to Landmann of the Elmo's Fire, but he denies that he ever purchased that ship or any vessel that he used to transport drugs. Juda further avers that the Elevation/Malekula was purchased by "the Canadian group with three bank transfers originating somewhere in Europe, with the cash transferred to another European bank into the account of the seller of the vessel." Juda Aff. ¶ 8 at 3-4. Juda claims that he simply found the vessel and forwarded the paperwork to Mr. Gaensslen, who acted as the middle man, and that he, Juda, was not paid to find the vessel. Whether or not Juda purchased the ship is immaterial.

Before the Malekula sank, federal agents recovered 632 kg of hashish from the vessel.  Two of the five crew members, Anthony Burg and Manuel Avila, had been involved in the 1989 drug smuggling operation aboard the Elmo's Fire.

After his arrest, Juda made statements in which he identified photographs of James Gaensslen and Robert Prellwitz.  Juda said he had met Gaensslen a few years earlier at Gaensslen's home in Florida when Gaensslen was looking for a boat captain.  Juda usually communicated with Gaensslen via Gaensslen's cellular telephone or through a P.O. box in Montreal, Quebec.  Juda found the Elevation and forwarded the purchase paperwork to Gaensslen.  Juda also stated that Gaensslen had not told him how much he would be paid for delivering the hashish.

Regarding Prellwitz, Juda said they had met in Cebu (an island in the Philippines) where Prellwitz gave him instructions on how, when and where to meet the mother ship to transfer the hashish for the 1991 smuggling operation.  When that meeting occurred, approximately 16 tons of hashish were transferred to the Malekula.  During the voyage the crew threw four tons of hashish overboard to avoid sinking.  Prellwitz also provided instructions on date and times of delivery in Canada, where the agreed offload site would be accessible only by sea.  Juda told the agents that the fire on board the Malekula was purposefully set in an attempt to destroy the evidence.

Juda also disclosed that in 1989 he was the captain of the Elmo's Fire on a voyage involving a hashish delivery to Canada.  The drugs were delivered in the summer of 1989. Gaensslen paid Juda for the 1989 operation in the fall of 1989 by handing him a bag containing Canadian currency worth approximately $400,000 in U.S. dollars.  Later, at the request of Juda, Prellwitz converted the Canadian currency and Juda was paid in U.S. currency in the United

States. Half the money was delivered to Juda in New York, and the other half in Florida. These money deliveries occurred in early 1990.

The Defendant Items of property were seized in New Mexico after Juda's arrest in 1991. The items of property are proceeds of the 1989 hashish smuggling venture to Canada. Juda has had no legitimate source of income dating from 1987.

**Discussion.**

*A.   FORFEITURE UNDER 21 U.S.C. § 881(a)(6).*   Under 21 U.S.C. § 881(a)(6) property that is proceeds traceable to an exchange of money for a controlled substance under the Controlled Substance Act is subject to forfeiture. It is obvious by now that the property sought to be forfeited constitutes proceeds of drug trafficking. The Court posed the question in the October 11, 2002 Memorandum Opinion and Order whether property found in the United States can be forfeited to the United States under this statute if it is proceeds of drug trafficking into Canada. This question may pose too narrow an inquiry because it focused only on the 1989 drug delivery to Canada, whereas the government now argues that Juda committed the crime of conspiracy in the United States, in violation of 21 U.S.C. § 846, which applies to drug conspiracies.[5]

The government asserts that Juda was involved in a continuing illegal conspiracy, which began in 1987 with his involvement in the delivery of marijuana to Oregon, which continued with the 1989 hashish delivery to Queen Charlotte Islands, British Columbia, Canada, and which ended with the 1991 attempted hashish delivery to Canada that was intercepted on the high seas and led to Juda's arrest and conviction. Further, the government asserts that in 1990 and 1991 Juda

---

[5] The statute provides: "Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

8

committed numerous overt acts in New Mexico in furtherance of the goals of the conspiracy, including discussions with an undercover agent to plan the 1991 delivery of hashish to Canada, and concealment of his drug proceeds to avoid detection by law enforcement. Thus, the government contends, the assets found in New Mexico and subject to this forfeiture action are the proceeds of Juda's illegal drug trafficking conspiracy, which included numerous overt acts in the United States and at least one delivery of drugs into the United States.

If a single conspiracy existed that included the 1987 delivery to Oregon, it is unnecessary to decide whether property that is proceeds of a drug importation into a foreign country is subject to forfeiture if the drugs were not intended for distribution in the United States.[6]

Whether a series of drug transactions constitutes a single conspiracy or multiple conspiracies is a factual question. *See* United States v. Record, 873 F.2d 1363, 1366-67 and n.1 (10th Cir. 1989). To prove a single conspiracy, the government must show an agreement that encompassed a common, illicit goal. United States v. Harrison, 942 F.2d 751, 755 (10th Cir. 1991). There must be a unity of purpose or a common design and understanding among the co-conspirators, as well as interdependence among the co-conspirators in carrying out that goal. Id. The conduct of the co-conspirators must be interdependent, even though it is "diverse and far-ranging" in time and location. Id. at 756 (*quoting* United States v. Daily, 921 F.2d 994, 1007 (10th Cir. 1990)). If the goals of the participants involved in different transactions are at cross purposes, however, the different transactions may represent multiple conspiracies. Harrison, 942 F.2d at 756.

---

[6] The government also argues that Juda violated 21 U.S.C. § 848 in the United States because he was engaged in a continuing criminal enterprise (CCE). Because conspiracy is a lesser included offense of CCE, Rutledge v. United States, 517 U.S. 292, 300, 307 (1986), it is unnecessary to reach this issue.

In Record, the defendant challenged his conviction on a single conspiracy charge.  The only overt act that took place in the district in which he was prosecuted occurred some three years after Record had been excluded from the conspiracy by his former coconspirators because they suspected he had shorted them in a previous delivery of cocaine.  Without a nexus to that district, the conviction would have been invalid because of improper venue.  The Tenth Circuit rejected Record's argument that any of the drug transactions that took place after his exclusion were separate from the conspiracy he was involved in.  Record's central role in the transactions that were completed prior to his exclusion was a significant factor in the appellate court's ruling.  The court also cited as significant factors the common purpose of all the incidents (to import drugs -- marijuana and cocaine -- into the United States for profit), and the same method of operation for each importation (flying the drugs from country of origin to an intermediate country, and transferring them onto a ship bound for Florida).  There was "a significant overlap in personnel, method of operation, and purpose throughout the period" to infer a single conspiracy.  Record, 873 F.2d at 1367.  *See also* United States v. Gomez, 810 F.2d 947, 950, 955 (10th Cir. 1987), where the court found a single conspiracy with multiple drug transactions that occurred over a period of several years and involved multiple co-conspirators.

In this case, the undisputed evidence supports a single conspiracy.  Juda played the central role of ship captain in transporting large amounts of drugs from Asia to North America in all three deliveries.  The method of transporting the drugs was the same in all three transactions.  The evidence tying together the 1987 and 1989 trips includes the fact that the same ship, the Elmo's Fire, was used in both shipments.  Juda claims that he never purchased any vessel that he used to transport the drugs, Juda brief, Doc. No. 40 at 3-4, which implies that the same ship owner was

involved in both those trips. He also refers to Mr. Gaensslen as his "boss." Juda brief, Doc. No. 40 at 6. Juda ties the 1987 trip to both the later trips with this statement: "The 1989 trip was made because the 1987 trip failed. The 1991 trip was planned in order to complete the recovery from the 1987 disaster." Juda Declaration ¶ 4 at 2.

There was an overlap of crew members aboard the two ships used in the 1989 and 1991 trips, and some of the same co-conspirators (Gaensslen and Prellwitz) were involved in the planning and financing of the operations. Also, the objectives and methods of operation were nearly identical. There were no cross purposes among any of the people involved in the three transactions. Although a significant amount of time elapsed between the trips, the destination changed after the 1987 shipment from the United States to Canada, and the type of drugs changed from Thai marijuana to hashish, there is no evidence that there were multiple separate conspiracies. Large shipments such as the ones Juda was involved in typically take a lot of planning. The decisions to begin importing drugs into Canada rather than the United States, and to switch from Thai marijuana to hashish, do not evince separate conspiracies. Rather, they manifest an evolving expertise in the drug trade with the common purpose to import large shipments of narcotics into North America from Asia for profit.

Juda claims that the three transactions were separate incidents and not part of an ongoing conspiracy because each trip was planned separately. He argues that the three trips involved similar methods only because they were all "maritime events requiring maritime preparations and actions." Juda brief, Doc. No. 40 at 8. He contends that the difficulty of planning each trip was "too complicated to worry about planning for another trip later on." Id. Juda seems to assume that a series of major drug transactions cannot constitute a single conspiracy unless they were all

11

planned at once.  This is simply not the law.

Because the government has carried its burden of showing by a preponderance of undisputed evidence that the Defendant Items of property sought to be forfeited were found in New Mexico, that they constitute proceeds of an ongoing conspiracy, and that the conspiracy was "in violation of this subchapter" within the meaning of 21 U.S.C. § 881(a)(6), the Defendant Items of property are subject to forfeiture in this district.  Therefore the motion for summary judgment will be granted to Plaintiff for forfeiture under § 881(a)(6).

B. *FORFEITURE UNDER 18 U.S.C. § 981(a)(1)(B).*  Even if the 1989 drug transaction involving delivery of drugs to Canada was not part of an ongoing, single conspiracy that included the 1987 delivery of drugs to the United States, this statute allows forfeiture to the United States of property derived from a foreign drug crime.  *See* United States v. Vacant Land known as Los Morros, 885 F.Supp. 1329 (S.D. Cal. 1995) (property located in Califormia acquired with proceeds of drug crime committed in Netherlands forfeited under 18 U.S.C. § 981(a)(1)(B)).

Plaintiff has presented sufficient undisputed evidence to show that all the elements for forfeiture under this statute have been met.  It is undisputed that hashish is a controlled substance under the Controlled Substances Act, and that the offense of importation of hashish into the United States would be punishable under the laws of the United States by imprisonment for a term exceeding one year.  Plaintiff has shown by the affidavit of Gary C. Valiquette that the importation of hashish into Canada is a felony offense against that nation, punishable by imprisonment for a term exceeding one year.  Juda has admitted that all the property sought to be forfeited is proceeds of the 1989 importation of hashish into Canada.

Juda argues that the statute is unconstitutional if it permits forfeiture without proving a

12

"nexus" showing that the Canadian activity is a violation of the United States Controlled Substances Act. He also claims that the statute exceeds the Commerce Clause limitations on congressional power, or is a violation of Article III of the Constitution. He also argues that forfeiture under this statute would violate his Fifth and Sixth Amendment rights to have a jury find the facts and his guilt.

This Court has already concluded that the statute is not unconstitutional as an exercise of the United States' extraterritorial jurisdiction, and that it does not exceed Congress' power under the Commerce Clause. Mem. Op. & Order, 6/16/03 at 7-8. Further, Juda's right to jury argument is not well-taken. Although it is not clear from his brief, he seems to argue that a jury must decide whether foreign drug trafficking affects commerce in the United States, or whether property found in the United States that is derived from foreign drug trafficking has a detrimental effect in the United States. *See* Juda brief, Doc. No. 40 at 12-13. These are not jury questions in a forfeiture action.

Juda's Article III argument is that if proof of a detrimental effect on commerce in the United States is not required under the statute, then the United States lacks standing to forfeit property found in the United States that is derived from a foreign drug crime. The Court rejects this argument. It is based on cases that have nothing to do with an *in rem* forfeiture of property. Juda's theory that the United States, as Plaintiff in this case, lacks Article III standing because it has not suffered a personal harm is unavailing. The United States has a valid interest in removing from commerce property derived from foreign drug crimes, and this statute accomplishes that purpose.

Thus, the motion for summary judgment will also be granted to Plaintiff for forfeiture

13

under 18 U.S.C. § 981(a)(1)(B).

THEREFORE IT IS ORDERED that Plaintiff's Second Motion for Summary Judgment (Doc. No. 27) is granted, Claimant's Cross Motion for Summary Judgment (Doc. No. 40) is denied, and a Summary Judgment of Forfeiture in favor of Plaintiff will be entered contemporaneously herewith.

IT IS FURTHER ORDERED that Claimant's Motion to Set Date and Time for Telephonic Summary Judgment Hearing (Doc. No. 42) is denied as moot.

_____
SENIOR UNITED STATES DISTRICT JUDGE